Good morning. May it please the Court, my name is Thomas Doyle. I'm here on behalf of the plaintiffs, the appellants in this matter. Before we get into the specifics in terms of the specific legal issues, I want to take a little bit of a big-picture look at what this case is about. This case is about a group of retirees who served as paperworkers for the defendant, in this case, Simpson Paper. They did so for a number of years. During that time, there was an early retirement provision that specifically states, if you retire early and you meet these conditions, you will have benefits between ages 55 and 65, and also provide for the spouses. These individuals retired under that provision, and that provision is clearly part of the collective bargaining agreement. They retired with the understanding that they would have coverage until age 65, and then that coverage was, in fact, provided for a number of years following not only their retirement, but also the closure of that mill. So the company lived according to the terms of that agreement for a number of years, as many as six, seven years, and then decided to curtail the benefits and ultimately cease the benefits prior to retirement. It's all a matter of contract, right? If the company agreed to it, they're bound by it. But if they didn't, they're not. That's absolutely correct, although there is a fiduciary duty issue that is in this case in terms of representations by the agent of the company at the time of the retirement. Well, let's start with the language in the agreement to begin with. As I understand it, the benefits are to be on the, quote, same basis as active employees, unquote. Do I have that correct? The specific language that's in the 1990 agreement is you will be able to change coverage at the annual enrollment on the same basis as active employees. The question of what the question of what the question of what the question Is it your position that portion is irrelevant or somehow we can look over it or? Not at all. Not at all. Well, then, I think you probably need to tell us how we can accommodate that language with your broader view of the arrangements that your clients hope for. Judge, you're absolutely right. And that's a key issue for what the district court looked at also. What the district court said was because there's a variability in that benefit is per se unvestable. And we are saying, no, that is a term of the benefit that's being offered. Yes, it can vary according to what is being offered to active employees during the active and open enrollment period. So, but why isn't the reservation clause dispositive of whether the plan vested? And can you point to any language in the plan where the company agreed to provide unalterable benefits? And this goes, first of all, remember, we're here on summary judgment. And we're here on summary judgment where there's a question of, okay, how do we interpret this contract? Is there any, and how do we interpret specifically that reservation of rights? I don't think anyone disagrees that the provision offering the benefits is relatively unambiguous. It's clear. The question becomes, is that reservation ambiguous or unambiguous? There is ambiguity as to what that reservation clause does. First of all, where it's located. It's located at the back of one of the benefit booklets, not located at the back of the other. The reservation language, and really the gist of this case in general is that reservation language was never intended as an altering of the benefit. What that reservation language specifically says is the coverage that's being provided to active employees and that's being provided to active employees can change subject to negotiation with the union. It's more than change. On page 82, I believe it is, it says in big letters, benefits can be changed or discontinued. And then it says the company deserves the right to alter and delete, cancel, or otherwise change welfare or pension benefits at any time subject to negotiation with the union. And the termination agreement was negotiated with the union. The termination agreement was negotiated with the union. So I just have difficulty when there's express language that says in big letters, we can discontinue your coverage if we negotiate with the union. They negotiated and the coverage ended pursuant to that negotiation. I don't see where there's an ambiguity. I beg to differ in terms of that the union, there's no evidence, and in fact, evidence quite to the contrary, that the union agreed to any changes in terms of benefit coverage. The termination agreement does not speak at all to cessation of retiree rights. There's two different issues here. One is, does the existence of that reservation language at all defeat any claim to vesting? And then the second issue, if there is a vested right, what are the terms of that vested right? But the closure agreement says that all existing agreements, in effect, are terminated as of the date of the closure. All existing agreements, and that's the collective bargaining agreement. And there's no question that the collective bargaining agreement ceased at the time of the, that's why they entered into the closure agreement, is to terminate the collective bargaining agreement. And the health and welfare benefits were to continue only for three months. That's correct in terms of active employees. But there's no evidence as to what the retirees that had already retired at the time. That takes you back to Judge O'Skinlan's question, which is, didn't the agreement also provide that retired employees would be treated the same as active? That is, everybody together would be terminated at the end of that three months. And the question is, is there a, was part of the closure agreement, term of that does that function to terminate everyone's benefits at the time of the end of that three months? That's a question of contract interpretation. The practice is that six years went by with narrow change in the benefits that were provided. No one ever interpreted that closure agreement, the parties to that agreement, nor the retirees, that somehow that was going to terminate the coverage at the time. That's a question of contract interpretation. There's facts out there one way or the other. Certainly, the practice was to continue on this coverage for those for a number of years following. The subject to negotiation language simply says that if, and that language was preexisting back into 1990 and well before, and it's just part of the ERISA plan, that, yes, the union can, with the agreement of the union, the union can change active employees' coverage. That is the context of that provision. As a result, when these individuals retired, that there was a variability in the benefit that it could be changed along with active employees, what was offered. Now, once again, we're into a factual area. What, you know, what does active employees mean? Does that mean current employees at the mill? Does that mean active employees of Simpson Paper? Simpson Paper never defended this case by saying, look, we closed this mill, there aren't active employees, so now we're providing it on the same basis of active employees, i.e., not at all. That was never an issue that was really raised in any substance along in the summary judgment process. And once again, their practice is that the active, the coverage that was offered was offered for six years or so following that closure. Roberts, Was there a particular event that triggered the termination in this case, the termination of the payment of benefits? I think Simpson made an internal decision based upon cost. That's the only indication that we have. There was nothing external that has ever been pointed to as resulting in a termination of the coverage pursuant to any contract. The issue, and once again, going back to what the district court said, was that because there's variability here, because this benefit can change, it's per se unvestable. We take issue with that and say, no, you can always make a benefit, offer a benefit that is based upon an external basis. And here, that's exactly what they did. They said, okay, well, we're going to keep providing on active employees. That does not defeat a vesting claim. Here also, the district court appeared to apply a presumption saying that it's relevant in the ERISA context, that unless you can say absolutely that there's this benefit being offered and that it's clear and unambiguous, we're going to find no benefit. That is not applicable in where we have a collective bargaining agreement that is by its definition contractual. And so as a result, what we have is we have reservation language, which, you know, do we know exactly what that reservation language means? We don't. But we do know that there is an unambiguous grant of a benefit to age 65, and we have That is what we have a trier of facts to determine, and we have a lot of extrinsic evidence that is relevant in the collective bargaining context that should have been considered through this process, the representations of the defendant's agents as these individuals are retiring, and what this active employee language means. What does that mean? That is a question of contract interpretation. Our position is that that cannot per se defeat the claim of vesting rights, which is what the district court found. On the fiduciary, the brief fiduciary duty, once again, it appears clear that failure to mention to individuals who are on their way out the door and retiring based upon this offer, and saying, yes, you will have coverage until age 65, failing to mention that, by the way, we might change that at any point. No, but why doesn't the provision that I read that was on page 82 of one of the contracts and 81 of the other, which says in really large letters, your benefits can be discontinued, where is the misrepresentation where that is of equal type size and everything else to the provision that you're relying on? Standing in the place of a retiring individual, as the benefits person is explaining and not mentioning anything about that, for instance, if the proposition that, listen, the termination, the termination of the collective bargaining agreement, the closure agreement, is the operative period when that benefit is no longer vested or is no, these individuals are no longer entitled, that was going to occur in a few months. Yet, the company is sitting there telling these retirees, you will have coverage until age 65, pointing to a provision that is at the back of a benefit booklet, you know, and that says that subject to negotiation with the union. So, there's, the retirees are in the position of looking at that language. I don't understand where there's a breach of duty where that information is also given to people. By law, these booklets were given to people. The collective bargaining agreement incorporated those booklets, and the booklets said, we can discontinue your benefits. There's a couple different answers to that. And, first of all, the benefit booklet, there's, the benefit booklets were not handed out at the time of retirement. The benefit booklets. They were handed out pursuant to the requirements of ERISA. They were, and there was a chart, there's evidence in the record where the benefit booklets were handed out several years, or a couple years prior, and returned back by the union to the company. If I remember actually, the benefit booklets were provided at some point in the past. So, there's no question that if the Court says, listen, anyone who is retiring and is sitting there in the exit interview, as they're being provided this benefit, is charged with knowing every document that has been provided to them over the last six years, and is charged with interpreting that provision so that even though it says the benefits will be changed subject to negotiation with the union, that that defeats any claim to vesting, then I think you're probably right. But those individual retirees in the position of listening to the management representative explaining what benefits there are, were not in a position where they could interpret this language in that way. And, certainly, if there's an ambiguity there, and if the company really did think that they had that right, they were under obligation to say, you will have this, you can retire now, you're taking this benefit now, you can retire now, we're going to provide up to 65 if we feel like it, which is really where what if you take the company's interpretation, which is really what the terms were, apparently. Mr. Hewitt, I think we understand your argument quite well. Perhaps we ought to hear from the company now, and you can reserve all of the remaining time. Thank you very much. Good morning. May it please the Court. I'm Doug Parker for Simpson Paper. Parker. The vesting issue certainly is central in this case, and certainly first start with the proposition that for a welfare benefit, such as a health insurance benefit, there is no presumption of vesting. Rather, the vesting must be established through the terms of applicable agreements. Counsel, I have two, I want to just point you to two things that concern me about your position, two, either ambiguities or provisions that where my understanding of them may not track with yours, and I'd like you to comment on that. The first has to do with the provision in the collective bargaining agreement where the same basis as active employees is mentioned. As Mr. Doyle said, that phrase comes in a rather limited sentence, which does not deal with the basic coverage. First, it says that coverage is going to be under the plan in which the employee was enrolled at the time of retirement, end of that sentence. Then it says, and I'm paraphrasing a little bit, but then it says that the employees will be able to change their benefits annually on the same basis as active employees. By the fact that those two are separate, it seems like the same basis as active employees does not limit the existing coverage of enrollment at the time of retirement. And the second ambiguity to me, or potential issue, is in the termination agreement itself, and it seems to provide, at least in some circumstances, for retiree coverage. I'm looking at Exhibit C, page 2, the lines are not numbered, but under the health and welfare benefits section, it seems to provide that certain employees who are being terminated pursuant to the closure agreement, at least, will be able to obtain retiree coverage subject to finalizing contracts with PACC. So I'm not sure I read the closure agreement as completely foreclosing health and welfare benefits to retirees on an ongoing basis. Sorry about the long question, but I wanted to point you to the things that bother me about your position. Let me address, Judge Graber, your first concern, and that is the language, if I understood your concern correctly, the language, same basis and applying to actives, what does that mean? And the fact that benefits can change, and I think it was the fact that benefits can change on enrollment that was your primary concern? Well, the way the phrasing is, and I'm doing this from memory right now, there's one sentence that says when you retire, your benefits will be under the terms of the contract that existed at the time you retired. That's the end of one thought, and separately, it says you will be eligible, or you can or you may or something like that, alter your benefits annually when active employees can on the same basis that they can, but that seems to be a completely separate thought. It seems like an absolute that you're going to be entitled to your benefits that were in existence at the time of retirement, end of sentence. I hope this is the simple answer that I'm understanding correctly, and that is for active employees, obviously every year under, as is the case under most health insurance plans, active employees have the ability to change their enrollment, to change dependents, to change liability, to change copayment, and so on. That was also provided to the retirees. The retirees, through the years of the collective bargaining agreement, floated same as, same as the active employees. The active employees' benefits were subject to negotiation every time the collective bargaining agreement came up. The retirees, those people who had already retired, were also subject to any changes that were negotiated in the overall level of benefits, and so on. But you really don't need to. And the language that Judge Graber points to is your position that that gives adequate notice to the retirees and protects the company's interpretation. Is that correct? Well, it is certainly one of the factors that demonstrates, certainly the fact that overall benefits are subject to negotiation is one of the clear factors that shows that these benefits were not immutable. What is your principal defense? Is it the language that reserves the right to cancel the plan, or is it this particular passage, same benefits as active employees? I think you have to read them all together, Your Honor. Same benefits, same as benefits means, again, the retirees already retired were subject to changes negotiated in the CBA. The reservation of rights made it very clear that benefits could be terminated or modified at any time. It seems to me, following along with your argument, pretty clear that the union could negotiate with the company to terminate everything. I think that probably even Mr. Doyle would agree that that's possible. Then the question, though, is whether the closure agreement actually did that, which takes me to my other question where there's no specific provision for people who've already retired, but there is a suggestion that extended active and retiree coverage, coverages could continue and would be subject to finalizing contracts with PACC. I don't know if that ever happened, but that's a factual question, not a contract interpretation question. A couple of things, Judge Graber. Number one, the no closure agreement did, in fact, extinguish the CBA, and I don't think there's any dispute in this case that that happened. The language in the no closure agreement that is applicable to individuals who retire indicates that they're eligible for retiree medical coverage in accordance with the provisions of the benefit plan booklet. The benefit plan booklet, in turn, makes clear two things. Again, as is treatment, and second, which obviously is no longer applicable if, in fact, you no longer have active employees, and I think the active employees stuck around for a few months as they were closing down the mill. But more importantly, for purposes of the no closure agreement, you go to the reservation of rights language, which is very clearly and unambiguously stated in that. Mr. Doyle suggested that some of these benefits extended beyond the closure, and I asked him, as you recall, was there a particular event that triggered the termination of the retiree benefits in this case? How would you answer that? Yeah, Mr. Doyle was correct. It was ultimately a financial decision, that ultimately this burden could no longer be I don't think there's any contest between the parties on that point, and the company exercised its rights under the reservation of rights clause to do that. But I think to hearken back, Judge O'Scanlan, to one of your questions, and that is, what's your primary defense? Again, you still have to read them all together, because the first question is, were these benefits as people were retiring while there was still an active collective bargaining agreement? Were these benefits vested and immutable, or on the other hand, were they not? And the answer is clearly that they were not. As to the fiduciary duty part of it, as an arrest of fiduciary, isn't Simpson Paper under a duty to provide sufficiently detailed information to employees to alert them of the precise nature and likelihood of the loss of benefits, and why then should Ms. Main have been required to affirmatively inform the retirees that the benefits could be terminated? Well, number one, yes, a fiduciary obligation does require that material terms not be misrepresented. The question is whether or not not telling retirees, as they were filling out the paperwork back in the days when nobody foresaw the mill closing, whether or not that, in fact, constituted a material misrepresentation to remind people of the reservation of rights clause in the benefits book. Well, but even if the mill hadn't closed, they still could terminate benefits, right? Yes. So really, the mill closing doesn't really matter about that. Why didn't she have to tell them your benefits could be terminated at some point? Back during the time that people are retiring? Mm-hmm. Well, she does, in the form that she gave to people, refer them to the benefits provisions, as I recall that form. Well, we know how that goes. She doesn't. I will certainly concede, Your Honor, that she does not recall ever telling any retiree that these benefits could someday be curtailed by the company. On the other hand, she does point out, she does point out the terms and conditions of the benefit provisions. And Judge Hagerty concluded on that basis that there was no misrepresentation. She was under no duty to spell out each and every term to these individuals upon retirement. There's been no evidence in this case that any one retiree acted to his or her, that anyone would not have retired because of anything that Cheryl mean. Why is that pertinent to a claim of breach of fiduciary duty, except as to damages, perhaps? It goes more, I think, to their estable argument, which is their companion claim there. Counsel, would you respond to Mr. Doyle's argument that, being reminded we're here on summary judgment, that there are questions of fact, or at least ambiguities, that would defeat summary judgment? What's your response to that? The terms and conditions spelled out in the benefits booklet and in the CBAs, again, you look at the CBAs as being applicable back during the pre-closure period, are unambiguous. They create a scenario where an individual's benefits are being treated the same as actives. Those active benefits are not immutable. They are subject to change. There is no ambiguity in that. There's no ambiguity, Your Honor, in the fact that the company reserved its rights in the benefit booklet. In terms of what happened thereafter, there likewise is no ambiguity. Individuals were very clearly in the mill closure agreement put on notice that their benefits were still subject to the benefit booklet, which again contains the reservation of rights clause. And those circuits that have dealt with reservations of rights clauses, they have clearly held that those extinguish any argument of ambiguity. Well, I'd like you to address maybe more precisely this one phrase on Exhibit C, page 2, in that closure agreement. In the part about health and welfare benefits, it has a number of paragraphs that deal with what will happen to active employees upon termination. Then there's an interesting paragraph that says employees who are curtailed as a result of the closure and begin receiving their Simpson Pension benefits as of the first of the month immediately following curtailment will be eligible for retiree medical coverage in accordance with the provisions of the benefits plan booklet. So that suggests to me that retiree medical coverage in accordance with the booklet is something other than what's been talked about before above that on page 2. And that the retiree coverage is subject to finalizing contracts with PACC. So it seems really circular to me because that takes you back to the question whether the provision saying you're going to get this from 55 to 65 is what is now being incorporated into the closure agreement. Yes. The closure agreement does incorporate the benefit booklet terms. And those benefit booklet terms do, in fact, have provisions called medical coverage for retirees age 55 to 65. Okay. And the answer you gave to Judge O'Scanlan earlier was that the reason why ultimately the company stopped paying benefits was financial. It was too expensive. Was that end of benefits negotiated with the union as distinct from the closure agreement itself, which clearly was negotiated? Yes. The union local that represented these male employees went out of business shortly after the mill closed. However, the international, upon getting notice of what Simpson intended to do, did ask for and had I think it was several meetings with Simpson representatives wherein they discussed this. Certainly, that comes within the purview of negotiation. It's subject to negotiation. The subject to negotiation language in the Reservation of Rights Clause, I think it's important to point out, does not require agreement. It requires negotiation. And I think that the court can certainly look at normal labor law principles on what bargaining obligations are. Does the record demonstrate negotiation to impasse? They certainly never reached agreement. Was there a formal declaration of impasse that would satisfy NLRB standards? I don't believe that that happened. But they certainly discussed it and ultimately Is that a problem for the claim, the non-ERISA claim then that's brought under Section 301? I don't think so, Your Honor. Again, the analysis there is whether or not there was a vested benefit that could that the employer was free or not free to terminate. And no, I don't think there's any effect of the course of the meetings that the parties had in 2002 on whether or not that is a preempted claim. Anything further, Counsel? No, Your Honor. Thank you. Mr. Doyle, you have some reserve time. Thank you very much, Your Honor. I will point the Court following up on that last issue in terms of the notice to the union and the negotiations. And the company has taken the position that negotiations just means saying we're going to change it and the union saying, please don't, and that complies with their requirements. We take umbrage with that and would indicate that that is a larger requirement of agreement, perhaps to impasse. The subject of negotiations language I think is ambiguous. It's not really clear what that means, but there's no evidence whatsoever that any negotiations actually took place or that it went to impasse as it would be under the NLRA. Pointing the Court to ER tab 26, page 106, which is the subsequent documents there, those are the letters that went back and forth in the minutes of the meeting where the company said, we have a right to do this. We're glad to explain why we have a right, but we have a right to do this. We can change whatever we want. I'm paraphrasing, but I think that's the result of those letters back and forth. In terms of the closure agreement, Judge Graber, I believe you're correct. And I think that looking at the Exhibit C, the supplemental excerpt of record, page 2, that clearly at the time of the closure, no one was thinking that there weren't going to be retiree benefits. In fact, this agreement, the closure agreement specifically says, listen, anyone who is curtailed as of next month as a result of this closure has eligibility for those retiree benefits. That is, in terms of the meaning of the contract, in interpreting what all this means that is a real good indication that, yes, retiree benefits were something that was being offered to facilitate the closure of this mill, and it was an offer that was being made to anyone that was being curtailed out as a result of the closure. The notion that the end so that goes to contract interpretation. What was the intent of the parties? What was expressed at the bargaining table? And here we have a closure agreement that specifically relates to that. Once again, going to, this is a factual determination. We don't know exactly how this all relates, but we do know that there is an offer of benefits to age 65, and then there are some provisions that the company is relying on to excuse their performance. That excuse of performance is based upon ambiguous language that is, and their proposed interpretation is inconsistent with their own practice, with their own agreements, and with the language, quite honestly. Roberts, would you remind me, we're talking about the termination of health insurance, medical coverage benefits. We're not talking about termination of pension benefits or anything like that. That's correct. That's correct, Your Honor. And although this is a health and welfare pension, and counsel began with the point of, listen, you use the ERISA standard, the presumption against, and that is not correct. We are not under the ERISA standard in terms of interpreting this collective bargaining agreement. We are under this Court's case law in terms of interpreting a collective bargaining agreement, and there, there is no presumption against. Under the Yardman cases, which we're not relying on here, there's a presumption actually in favor of finding that, yes, that benefit is vested. We don't need any presumption under Yardman. We have very plaintiff. All you need is, for now, is an ambiguity to get you back to district court. All we need is an ambiguity that gets us back to the court, back to the district court. And this language, at best, it's a mess in terms of figuring out how these reservations and this active employee language relate. But it's clear it's not unambiguous, despite counsel's assertions to the contrary. And it's clear that there's a whole lot of extrinsic evidence and a lot of internal evidence in terms of the context. No one was thinking at the time that this reservation language somehow limited the explicit grant of a retiree benefit. The reservation language is simply relating to the ability for the company to change plans when the – during negotiations for active employees. This argument that somehow, because of this incorporation, and we're not taking issue with the textual argument. We recognize that there is a textual argument there. But the intent of the parties was, at the time of entering into this, was to simply preserve the right for the company to be able to change active employees. And now, seven years later, six years later, now we're almost at 10, that this language is being used to avoid the explicit promises that were made. In terms of the ERISA fiduciary duty, the notion that an agent of the employer does not have a duty to tell someone in the same breath that, yes, as they're saying, you will have coverage. If you take this option, you will have coverage until age 65. If the notion that they do not have the duty also to reference not every specific provision, but something at least saying, listen, we can end that tomorrow. That is the position of the company now. If that is correct, we say it's not under our 301 claim. But if that's correct, there is no question that that plan administrator or that, sorry, that agent has a duty to also inform the retiree who's going out based on this offer that, yeah, that offer really isn't worth the paper it's written on. That is what the company is saying, is that's just one of those minor details. That is an essential and material term of the offer and of the benefit that's being offered to these retirees, that, no, you won't have coverage tomorrow if we decide it costs too much. Anything further? Nothing further, Your Honor. Thank you, counsel. The case just argued will be submitted for decision. And we will hear argument next in Reyna v. the City of Portland.
judges: O'scannlain, Graber, Callahan